# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-2309V

| | |
|---|---|
| WILLIAM M. ROBERSON,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: January 24, 2025 |

*William Bliss Hicky*, Attorney at Law, Nashville, TN, for Petitioner.

*Emilie Williams*, U.S. Department of Justice, Washington, DC, for Respondent.

### RULING ON ENTITLEMENT[1]

  On December 20, 2021, William M. Roberson filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received on September 23, 2020.[3] Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] The preamble to the Petition states that Petitioner's injury resulted from a pneumococcal conjugate vaccine. Petition at 1. However, the remainder of the Petition and medical records refer to a flu vaccine (and therefore the preamble reference to a different vaccine appears to be a typographical error).

On June 15, 2023, Respondent stated that he was amenable to informal resolution, and the parties negotiated (ECF Nos. 26-31). However, they were unable to reach an agreement, and briefed Petitioner's entitlement to compensation (ECF Nos. 32, 33, 35). For the reasons discussed below, I find that record evidence preponderantly establishes that the onset of Petitioner's shoulder pain began within 48 hours of vaccination, and that he has satisfied the remaining requirements for entitlement.

## I. Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of

2

other award or settlement,[4] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they:

> (i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

Section 11(c)(1)(D).

"[T]he fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where the petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where the petitioner sought care for four months, followed by fifteen month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where the petitioner did not seek additional treatment after the five month mark.

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria

---

[4] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### B. Relevant Factual History

This ruling contains only a brief overview of facts most relevant to the parties' dispute.

#### 1. Medical Records

On September 23, 2020, Petitioner received a flu vaccine in his left deltoid. Ex. 2 at 4. Twenty-three days later (October 16, 2020), he saw orthopedist Dr. Gene Hannah

4

complaining of left shoulder pain. Ex. 3 at 749. Petitioner explained that the pain had been present for "2-3 wks" and that he could not recall a specific cause of his pain, although "[c]oincidentally he had a flu shot at that time." *Id.* He described an intermittent sharp or aching pain up to three out of ten in intensity around the deltoid aspect of his shoulder with reaching or lifting, and said it hurt to lie on that side at night. *Id.* at 751. He used a keyboard throughout the day and noted discomfort afterward at times. *Id.* He could not recall an injury or change in his activities. *Id.*

On examination, Petitioner had good motion with mild pain in the mid-range, pain in the Hawkins impingement position, and mild pain at the end range of internal rotation. Ex. 3 at 749. A left shoulder x-ray showed mild arthritis but was otherwise normal. *Id.* Dr. Hannah assessed Petitioner with left shoulder rotator cuff tendinopathy with arthritis and periscapular weakness, and advised that he modify activities, use an anti-inflammatory medication, and attend physical therapy ("PT"). *Id.*

Three weeks later (November 6, 2020), Petitioner underwent a PT evaluation. Ex. 3 at 710. The PT record lists an "onset date" of October 16th. *Id.* However, it also says that Petitioner's "left shoulder has been bothering him for about a month that started as a pin point sharp pain in his left lateral shoulder." *Id.* at 713. He had been working at home since March and had a hard time making his work area comfortable. *Id.* He also stated that "he did have a flu shot in that arm about the time it started bothering him." *Id.* He had difficulty holding his phone in his left hand, moving or lying on his left shoulder, and reaching behind him. *Id.* He rated his pain as three out of ten. *Id.* On examination of his left shoulder, Petitioner reported pain through the mid-range in abduction, and pain at the end range in internal rotation. *Id.* His posterior shoulder capsule was "slightly tight" and he had positive Neer's impingement signs. *Id.* at 713-14. He was assessed with tendonitis/tight posterior capsule. *Id.* at 714. Petitioner had three more PT sessions in November. *Id.* at 643-701.

Petitioner followed up with Dr. Hannah on November 23, 2020. Ex. 3 at 630. His pain was no worse, but he still had pain around the deltoid area of his arm with reaching and lifting. *Id.* at 632. On examination, he had full active overhead range of motion ("ROM") without pain, but mild discomfort at the end range with internal rotation and discomfort with supraspinatus and internal rotation strength testing. *Id.* Dr. Hannah modified Petitioner's rehab exercises and offered an injection, which Petitioner declined. *Id.*

A few weeks later (December 14, 2020), Petitioner sent an electronic message to Dr. Hannah. Ex. 3 at 629. Petitioner stated that his shoulder was not improving, and hurt at a low level of one to two all the time, worsening with certain movements. *Id.* Every other night he woke up with pain at a level of five or six, and had difficulty finding a comfortable position and going back to sleep. *Id.* He was doing exercises with a band, although he was not doing a couple of the exercises that caused pain. *Id.* Petitioner added that he had

received a flu vaccine at Walgreens on September 23rd and "didn't have this pain before that." *Id.* He wanted to rule out SIRVA, and asked about an MRI. *Id.* Dr. Hannah ordered an MRI. *Id.* at 627.

A left shoulder MRI performed on December 28, 2020, showed moderate tendinopathy involving the infraspinatus, supraspinatus, and subscapularis tendons without a focal tear, as well as degenerative tearing of the labrum. Ex. 3 at 621. There was no joint effusion or fluid within the subacromial or subdeltoid bursae. *Id.*

Petitioner returned to Dr. Hannah on January 6, 2021, to review the MRI. Ex. 3 at 605. Petitioner continued to have shoulder discomfort and had reduced his therapy exercises due to worsening of his shoulder. *Id.* at 606. He had asked for a keyboard tray to improve his work environment at home. *Id.* On examination, he had good motion, with mild tightness at the end range in internal rotation and pain in the Hawkins impingement position. *Id.* at 607. Dr. Hannah assessed Petitioner with left rotator cuff tendinopathy and administered a steroid injection. *Id.*

Three weeks later (January 26, 2021), Petitioner sent Dr. Hannah an electronic message stating that he had not seen much improvement since the steroid injection. Ex. 3 at 601. He was continuing to do home exercises and use ice, heat, and over the counter medication. *Id.* His stated that his shoulder "pops quite often," and he was still waking at night with sharp pain. *Id.* Dr. Hannah referred him to orthopedic surgeon Dr. John Kuhn. *Id.*

Petitioner saw Dr. Kuhn less than a week later (February 1, 2021). Ex. 3 at 582. Petitioner explained that his left shoulder pain "began in September 2020 without injury and has progressed over time." *Id.* at 584. He associated the onset of his pain with "the start of working from home and getting a flu shot." *Id.* He described his pain as aching at rest, but it could be stabbing with certain activities, and rated it as two out of ten. *Id.* On examination, his left shoulder ROM was 180 degrees with a painful arc in forward elevation, 60 degrees in external rotation with his arm abducted, and zero degrees in internal rotation with his arm abducted. *Id.* Dr. Kuhn diagnosed Petitioner with left shoulder adhesive capsulitis, and administered a steroid injection into Petitioner's left glenohumeral joint. *Id.*

Petitioner followed up with Dr. Kuhn the following month (March 3, 2021). Ex. 3 at 526. His shoulder was hurting less often, he had no pain at rest, and he was having sharp pains less frequency. *Id.* at 528. Although the record shows that his left shoulder ROM in forward elevation was now 140 degrees, Dr. Kuhn noted his ROM and pain as having improved, stating that Petitioner had entered the thawing stage and thus should begin PT. *Id.*

Petitioner underwent a PT evaluation on March 18, 2021. Ex. 3 at 467. That record sets forth an onset date of September 23, 2020 (the vaccination date). *Id.* at 468. The

6

evaluation explains that Petitioner had received a flu vaccine on September 23, 2020, and "his arm was sore from that but it seemed like it never stopped hurting." *Id.* at 471. He rated his pain as seven out of ten. *Id.* On examination, his left shoulder active ROM was 90 degrees in flexion, to his L5 vertebrae in internal rotation, and 25 degrees in external rotation. *Id.*

Petitioner returned to Dr. Kuhn on June 9, 2021. Ex. 3 at 370. He was doing well and no longer had pain at rest, and his ROM had improved. *Id.* at 372. Although he continued to have intermittent pain, he had been able to sleep through the night in the past week. *Id.* He continued PT until August 2021, and continued seeing Dr. Kuhn. Ex. 3 at 90, 250, 303-458; Ex. 6 at 77.

### 2. Affidavits

Petitioner filed three affidavits in support of his claim. Exs. 1, 4, 5. Petitioner states that on the evening of September 23rd (the day he received the vaccine), he began noticing soreness in his left arm. Ex. 1 at ¶ 4. The injection site was slightly swollen, and he felt a general ache and sharp pain in a pinpoint location in his upper arm. *Id.* He had difficulty moving his arm laterally and sleeping. *Id.* at ¶¶ 4, 6. He assumed that the pain would resolve in a few days, and took anti-inflammatory medication and applied heat and cold for pain relief. *Id.* at ¶ 5. He explains that he and his wife are the primary caregivers for his elderly mother in law, and they wanted to avoid going to the hospital due to concerns about the COVID-19 virus. *Id.* However, the pain persisted over the next couple of weeks, so he made an orthopedic appointment. *Id.* at ¶ 7.

Donna Rosenstiel, Petitioner's wife, filed an affidavit on his behalf. Ex. 4. She states that Petitioner's arm was sore within 24 hours after vaccination, but they both assumed it was a normal reaction to vaccination. *Id.* at ¶ 3. Even when the symptoms continued for several days they did not worry. *Id.* at ¶ 4. However, once a week passed, she became concerned. *Id.* at ¶ 5. When Petitioner started having difficulty moving his arm without pain she became very concerned, and they discussed making an orthopedic appointment. *Id.* at ¶ 6. Ms. Rosenstiel explains that since the beginning of the COVID-19 Pandemic, she and Petitioner had worked from home and "avoided all but the most critical trips outside of our home, in order to avoid being infected with COVID." *Id.* at ¶ 9.

John Roberson, Petitioner's father, filed an affidavit on his behalf. Ex. 5. Petitioner's father states that as soon as Petitioner received his flu vaccine, he told his father that his left arm was painful and he had lost mobility. *Id.* at ¶ 2.

### C. The Parties' Arguments

Petitioner asserts that the record evidence preponderantly demonstrates that the onset of his shoulder pain occurred within 48 hours of vaccination, and that he has also met the remaining SIRVA QAI and statutory requirements and is entitled to compensation. Petitioner's Motion for a Ruling on the Record on Entitlement, filed Nov. 8, 2023 (ECF No.

32) ("Mot."). Petitioner relies heavily on affidavit evidence, and asserts that Respondent "has failed to raise significant evidence to challenge this finding." Mot. at *9.

Respondent argues in reaction that the actual onset date of Petitioner's shoulder pain is unclear. Respondent's Rule 4(c) Report and Response to Petitioner's Motion, filed Dec. 19, 2023, at *8 (ECF No. 33) ("Resp."). Respondent maintains that I cannot make a finding of fact based on witness testimony alone, citing *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993) and *Clavio v. Sec'y of Health & Human Servs.*, No. 17-1179, 2020 WL 1672956, at *7 (Fed. Cl. Spec. Mstr. Mar. 11, 2020). Resp. at *8. And "oral testimony in conflict with contemporaneous documentary evidence deserves little weight." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1382 (Fed. Cir. 2021) (citing *Cucuras*, 993 F.2d at 1525). *Id*.

Respondent asserts that this is not a case where the medical records are silent on onset. Rather, the records "repeatedly discuss onset and demonstrate that the onset of petitioner's shoulder pain was likely not within 48 hours" of vaccination because Petitioner "could not provide a specific onset date to a single medical provider." Resp. at *9. Thus, at Petitioner's first post-vaccination appointment 23 days after vaccination, Petitioner did not "specifically describe onset nor implicate his flu shot as causative." *Id*. And at his November 6, 2020 PT evaluation, Petitioner "was again unable to provide a specific onset date for his shoulder pain, stating that it began about 'a month' earlier, putting onset in early October 2020." *Id*. Although Petitioner also reported receiving a vaccination around the time his pain started, he also said that he had been working since March 2020 at an uncomfortable workstation. *Id*.

Respondent notes as well that in February 2021, Petitioner provided Dr. Kuhn with "only a vague onset date, explaining that his shoulder pain began in September 2020." Resp. at *9. Although Petitioner again said the pain began around the time of his vaccination, he also again associated his pain with the start of working from home. *Id*.

Respondent takes issue with Petitioner's affidavit, describing it as being written "for this litigation" and "years after the vaccination at issue" (although it was signed in December 2021, approximately a year and three months after vaccination). Resp. at *9. Respondent argues that "petitioner did not explain how he now suddenly remembers a specific onset date for his pain, when he was not able to provide any specific onset date to a medical provider over the prior three years." *Id*. at *9-10. And even if he did explain his recollection, Respondent asserts, Petitioner would be "asking this court to accept testimony that appears to be consistently contradicted by petitioner's own contemporaneous medical records," contrary to the Federal Circuit's guidance in *Cucuras*. *Id*. at *10.

Petitioner replies that preponderant evidence supports the conclusion that Petitioner suffered a Table SIRVA injury. Petitioner's Reply, filed Jan. 23, 2024, at *2 (ECF No. 35) ("Reply"). Petitioner points out that at his first medical appointment 23 days

after vaccination, he reported that his pain had been present for two to three weeks – and that an injury duration of three weeks, or 21 days, would place onset within 48 hours of vaccination. Reply at *3-4. Moreover, he notes that two to three weeks is "a colloquial approximation of time" and should be interpreted as such. *Id.* at *4.

More broadly, Petitioner argues that the purpose of Petitioner's medical appointments was to obtain relief for his shoulder pain, and that doing so was not necessarily depending on precisely when the symptoms began. Reply at *4. Petitioner asserts that Respondent's position "fails to take into account real-world limitations," and Petitioner's failure to specifically describe onset or implicate his vaccination is not, by itself, a reason to rule against him. *Id.* Petitioner also emphasizes the effect of the COVID-19 Pandemic, which led him to delay seeking care until 23 days after vaccination. *Id.* at *5.

Petitioner cites my rulings in *Coluccio v. Sec'y of Health & Human Servs.*, No. 19-1684V, 2022 WL 766198 (Fed. Cl. Spec. Mstr. Feb. 9, 2022) (finding onset occurred within 48 hours where claimant first sought care 27 days after vaccination complaining of pain for three weeks) and *Accetta v. Sec'y of Health & Human Servs.*, No. 17-1731V, 2020 WL 3970180 (Fed. Cl. Spec. Mstr. June 11, 2020) (finding onset occurred within 48 hours where the petitioner first reported shoulder pain 29 days after vaccination and provided a date *three days* after vaccination, and did not clearly complain of shoulder pain at two intervening appointments). Like the *Coluccio* petitioner, Mr. Roberson "did his best to estimate how much time passed since his pain started." Reply at *6. And Petitioner stresses my reasoning in *Accetta* that the Vaccine Act allows a special master to find that onset occurred within the Table timeframe even if it was not recorded, or incorrectly recorded, in medical records. *Id.* at *7.

### D. Factual Finding Regarding QAI Criteria for Table SIRVA

#### 1. Onset

The totality of the record preponderates in favor of the conclusion that the onset of Petitioner's left shoulder pain occurred within 48 hours of vaccination. Petitioner first sought care for his shoulder pain just 23 days post-vaccination. At this appointment he said the pain had been present for two or three weeks. Ex. 3 at 749. Although he stated he could not recall a specific cause, he added that he had received the flu vaccine at the time his pain began. Thus, the earliest treatment record at which pain was reported seems to corroborate Petitioner's onset contentions.

Respondent interprets Petitioner's statement that he could not recall a cause as casting doubt on the relationship between vaccination and Petitioner's injury. But it is just as likely, if not more so, that Petitioner simply did not realize that a vaccination *could* cause a shoulder injury. *See, e.g., Bulman v. Sec'y of Health & Human Servs.*, No. 19-1217V, 2023 WL 5844348, at *3 (Fed. Cl. Spec. Mstr. Aug. 16, 2023) (discussing expert

9

report stating that most people are unaware that a vaccine can cause significant shoulder dysfunction, and thus may not attribute symptoms after vaccination to the vaccine). The Program recognizes that claimants do not expect vaccination to harm them this way, and that this can in turn cause them to delay treatment – or here, be unspecific about a precise onset date.

Furthermore, at the first PT evaluation a month and a half after vaccination, Petitioner complained of pain that had been bothering him for "about a month," and again said that "he did have a flu shot in that arm *about the time* it started bothering him." Ex. 3 at 713 (emphasis added). And when he saw Dr. Kuhn in February 2021, Petitioner reported left shoulder pain that "began in September 2020," associating it with his vaccination.[5] Ex. 3 at 584. Petitioner and his wife also both state that Petitioner's shoulder pain began within a day of vaccination, and his father's affidavit supports this. Exs. 1, 4, 5.

Respondent places great emphasis on the lack of a precise onset date in the medical records, and Petitioner's failure to so specify. Admittedly, Petitioner instead often spoke in colloquial terms – as many people do when seeking medical attention – and explained that his pain had been present for two or three weeks. But I do not consider the absence of a specific date to be compelling or particularly meaningful. While a precise date is certainly helpful in determining when the onset of symptoms occurred, it is expressly *not* required by the Vaccine Act. Section 13(b)(2). What is required is that Petitioner demonstrate by a *preponderance* of the evidence that the onset of his shoulder pain *likely* occurred within 48 hours of vaccination.

In finding that a preponderance of the evidence supports such a finding, I do *not* rely solely on witness testimony. Rather, I find that the medical records, as corroborated by affidavit evidence, support this finding. And there is no meaningful contradiction between statements in Petitioner's affidavit and the medical records concerning onset. While these two sets of evidence are not identical on the subject, they are not required to be, and commonly are not. Rather, the witness statements provide details missing from the records. Thus, Petitioner has explained that he began noticing soreness the night of vaccination, and that rather than going away, the pain persisted. This is consistent with his report to Dr. Hannah that his pain had been present for two or three weeks around the time of his vaccination. *Coluccio*, 2022 WL 766198, at *5.

---

[5] Petitioner also related the onset of his shoulder pain to "the start of working at home." Ex. 3 at 584. However, he started working at home in March 2020 (*Id.* at 713), and did not seek care for shoulder pain between March and September 2020 (*Id.* at 762-967). Thus, preponderant evidence supports a finding that Petitioner's shoulder pain began after vaccination, although his work ergonomics may have contributed to his pain.

10

### 2. Other SIRVA QAI Criteria and Claim Elements

The remaining SIRVA QAI criteria are not contested, and I find that they are satisfied. There is no evidence that Petitioner had a pre-vaccination left shoulder condition, or another condition or abnormality, that would explain his symptoms after vaccination. Ex. 3 at 629-903; *see also* Ex. 1 at ¶ 3. Petitioner's symptoms were limited to his left shoulder, where he received the flu vaccine. Ex. 3 at 584, 632, 713, 751.

The record establishes that Petitioner received a covered vaccine in the United States. Ex. 2 at 4. He experienced the residual effects of his condition for more than six months. Ex. 3 at 370, 455. And he states that he has never received compensation in the form of an award or settlement, or filed a civil action prior to filing this petition, for his vaccine-related injuries. Ex. 1 at ¶ 19.

### Conclusion

Based on my review of the record as a whole, I find that it is more likely than not that the onset of Petitioner's shoulder pain occurred within 48 hours of vaccine administration, and that all other SIRVA Table requirements, as well as all statutory requirements, are met. Therefore, Petitioner's motion for a ruling on the record that he is entitled to compensation is **GRANTED**.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master