# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
**No. 21-2309V**

|  |  |
|---|---|
| WILLIAM M. ROBERSON,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: June 16, 2026 |

*William Bliss Hicky, Willian B. Hicky, Attorney at Law, Nashville, TN, for Petitioner.*

*Emilie Williams, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING DAMAGES[1]

On December 20, 2021, William M. Roberson filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received on September 23, 2020.[3] Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website , and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] The preamble to the Petition states that Petitioner's injury resulted from a pneumococcal conjugate vaccine. Petition at 1. However, the remainder of the Petition and medical records refer to a flu vaccine (and therefore the preamble reference to a different vaccine appears to be a typographical error).

On January 24, 2025, I issued a ruling finding that Petitioner is entitled to compensation (ECF No. 37). The question of damages has now been fully briefed and is ripe for resolution (ECF Nos. 42, 48, 49). For the reasons set forth below, I find that Petitioner is entitled to a damages award of **$65,000.00 for actual pain and suffering, but no damages for future pain and suffering. Additionally, I find that Petitioner is entitled to $1,120.41** for past unreimbursable expenses.

I.    **Relevant Facts**

   **A. Medical Records**

On September 23, 2020, Petitioner received a flu vaccine in his left deltoid. Ex. 2 at 4. On October 16, 2020 (23 days later), he saw orthopedist Dr. Gene Hannah complaining of left shoulder pain. Ex. 3 at 749. Petitioner explained that the pain had been present for "2-3 wks," and that he could not recall a specific cause of his pain, although "[c]oincidentally he had a flu shot at that time." *Id*. He described an intermittent sharp or aching pain up to three out of ten in intensity around the deltoid aspect of his shoulder with reaching or lifting, and said it hurt to lie on that side at night. *Id*. at 751.

On examination, Petitioner had good motion with mild pain in the mid-range, mild pain in the Hawkins impingement position, and mild pain at the end range of internal rotation. Ex. 3 at 749. A left shoulder x-ray showed mild arthritis but was otherwise normal. *Id*. at 751. Dr. Hannah assessed Petitioner with left shoulder rotator cuff tendinopathy with arthritis and periscapular weakness, prescribed anti-inflammatory medication and physical therapy ("PT"), and recommended that he modify activities. *Id*.

Three weeks later (November 6, 2020), Petitioner underwent a PT evaluation. Ex. 3 at 710. Petitioner stated that his "left shoulder has been bothering him for about a month that started as a pin point sharp pain in his left lateral shoulder." *Id*. at 713. He also stated that "he did have a flu shot in that arm about the time it started bothering him." *Id*. He had difficulty holding his phone in his left hand, moving or lying on his left shoulder, and reaching behind him. *Id*. Petitioner reported pain through the mid-range in abduction and at the end range in internal rotation, which he rated three out of ten. *Id*. On examination Petitioner's posterior shoulder capsule was "slightly tight" and he exhibited positive Neer's impingement signs. *Id*. at 713-14. He was assessed with tendonitis/tight posterior capsule. *Id*. at 714. Petitioner had three more PT sessions in November. *Id*. at 643-701.

Petitioner followed up with Dr. Hannah on November 23, 2020. Ex. 3 at 630. His pain was no worse, but he still had pain around the deltoid area of his arm with reaching and lifting. *Id*. at 632. On examination, Dr. Hannah noted full active overhead range of motion ("ROM") without pain, but mild discomfort at the end range with internal rotation and discomfort with supraspinatus and internal rotation strength testing. *Id*. Dr. Hannah

2

modified Petitioner's rehab exercises and offered an injection, which Petitioner declined. *Id*.

A few weeks later (December 14, 2020), Petitioner messaged Dr. Hannah that his shoulder was not improving, and hurt at a low level of one to two out of ten all the time, worsening with certain movements. Ex. 3 at 629. Every other night he woke up with pain he rated five or six, and had difficulty finding a comfortable position and going back to sleep. *Id*. He was doing exercises with a band, although he was not doing a couple of the exercises that caused pain. *Id*. He requested an MRI. *Id*.

A left shoulder MRI performed on December 28, 2020, showed moderate tendinopathy involving the infraspinatus, supraspinatus, and subscapularis tendons without a focal tear, as well as degenerative tearing of the labrum. Ex. 3 at 621. There was no joint effusion or fluid within the subacromial or subdeltoid bursae. *Id*.

Petitioner returned to Dr. Hannah on January 6, 2021, to review the MRI. Ex. 3 at 605. His shoulder discomfort had worsened, and consequently he had reduced his therapy exercises. *Id*. at 606. On examination, he exhibited good ROM, with mild tightness at the end range in internal rotation and pain in the Hawkins impingement position. *Id*. at 607. Dr. Hannah assessed Petitioner with left rotator cuff tendinopathy and administered a steroid injection. *Id*.

Three weeks later (January 26, 2021), Petitioner messaged Dr. Hannah that he had not seen much improvement since the steroid injection. Ex. 3 at 601. He continued to do home exercises and use ice, heat, and over the counter medication. *Id*. He stated that his shoulder "pops quite often," and he was still waking at night with sharp pain. *Id*. Dr. Hannah referred him to orthopedic surgeon Dr. John Kuhn. *Id*.

Petitioner saw Dr. Kuhn less than a week later (February 1, 2021). Ex. 3 at 582. Petitioner explained that his left shoulder pain "began in September 2020 without injury and has progressed over time." *Id*. at 584. He described his pain as aching at rest, and sometimes stabbing with activity, and rated it two out of ten. *Id*. Petitioner's ROM was 180 degrees in forward elevation, zero degrees in internal rotation with his arm 90 degrees abducted, and 40 degrees in internal rotation with his arm at his side. *Id*. Dr. Kuhn diagnosed Petitioner with left shoulder adhesive capsulitis, and administered a steroid injection into Petitioner's left glenohumeral joint. *Id*. at 585.

Petitioner followed up with Dr. Kuhn the following month (March 3, 2021). Ex. 3 at 526. He felt no pain at rest, and experienced sharp pains less frequently. *Id*. at 528. Dr. Kuhn determined that Petitioner's ROM and pain had improved, and that he had entered the thawing stage of adhesive capsulitis and thus should return to PT. *Id*.

Petitioner underwent a PT evaluation on March 18, 2021. Ex. 3 at 467. Petitioner explained that following vaccination "his arm was sore from that but it seemed like it never stopped hurting." *Id*. at 471. He now rated his pain seven out of ten, describing it as

3

"moderately severe and moderately irritable." *Id*. at 471, 473. On examination, his left shoulder active ROM was 90 degrees in flexion, to his L5 vertebrae in internal rotation, and 25 degrees in external rotation. *Id*. at 471.

On May 25, 2021, Petitioner reported in PT that he was no better, and "in fact may be worse." Ex. 3 at 392. He had been awake for over four hours with shoulder pain the night before. *Id*. He rated his pain five out of ten. *Id*.

Petitioner returned to Dr. Kuhn on June 9, 2021. Ex. 3 at 370. He was doing well, with improved ROM and no pain at rest. *Id*. at 372. Although he continued to experience intermittent pain, he had been able to sleep through the night in the past week. *Id*. On examination, his ROM in internal rotation with his arm at his side was to the sacroiliac (hip) joint, and internal rotation with his arm abducted 90 degrees was zero degrees. *Id*.

On July 19, 2021, Petitioner reported in PT that he had been feeling better overall for the past few weeks, with less intense pain, and that he was now able to sleep through the night. Ex. 3 at 330. He rated his pain two out of ten. *Id*.

On August 11, 2021, Petitioner attended his last PT visit, after a total of seven visits between March 18 and August 11, 2021. Ex. 3 at 304. Some of his exercises were causing pain, which he rated four out of ten. *Id*. at 305. The therapist noted that after some adjustments, his pain level had improved. *Id*. at 306. Petitioner was discharged with instructions to follow up as he improved and was ready for new exercises. *Id*.

Petitioner returned to Dr. Kuhn on August 25, 2021, stating that he "definitely ha[d] improved," but felt he had reached a plateau.. Ex. 3 at 252. His sleep had been interrupted by pain recently. *Id*. They discussed operative treatment, but Petitioner elected to continue with conservative treatment. *Id*. at 253.

Two months later (October 27, 2021), Petitioner returned to Dr. Kuhn, reporting additional improvement since his last visit. Ex. 3 at 92. Although he was not yet "completely normal," his ROM had improved and he was able to do normal daily activities, and was happy with his progress. *Id*. Dr. Kuhn noted that he had made "great progress and should continue to improve with stretching," and return as needed. *Id*.

Nearly a year later, on September 7, 2022, Petitioner followed up with Dr. Kuhn. Ex. 6 at 78. He now reported that his shoulder pain was not as severe as it had been, rating it one out of ten and "chronic in nature." *Id*. at 79. His pain worsened with typing and driving. *Id*. On examination, his left shoulder ROM in internal rotation with abduction was ten degrees. *Id*. at 81. Dr. Kuhn showed him some stretching exercises to do at home, and stated Petitioner should return if he had not improved in six weeks, and Dr. Kuhn would order PT. *Id*. at 82. He assessed Petitioner with "adhesive capsulitis mostly resolved with still some posterior capsule tightness." *Id*. Petitioner has not filed further treatment records.

4

### B.  Testimonial Statements

Petitioner filed three affidavits in support of his claim. Exs. 1, 4, 5. Petitioner states that on the evening of September 23rd (the day he received the vaccine), he began noticing soreness in his left arm. Ex. 1 at ¶ 4. The injection site was slightly swollen, and he felt a general ache and sharp pain in a pinpoint location in his upper arm. *Id*. He had difficulty moving his arm laterally and sleeping. *Id*. at ¶¶ 4, 6. He assumed that the pain would resolve in a few days, and took anti-inflammatory medication and applied heat and cold for pain relief. *Id*. at ¶ 5. He explains that he and his wife are the primary caregivers for his elderly mother-in-law, and they wanted to avoid going to the hospital due to concerns about the COVID-19 virus. *Id*. However, because the pain persisted over the next couple of weeks, he made an orthopedic appointment. *Id*. at ¶ 7.

Petitioner began to experience difficulty sleeping due to "severe pain" when he awoke from rolling onto his arm. Ex. 4 at ¶ 6. He described his pain as constantly moderate, between three and five out of ten, with "frequent episodes of intense, unbearable pain" that he rated between eight and ten. *Id*. He recalls an episode where an insect landed on his neck and he instinctively swatted it away with his left arm, stating that the pain from doing so was "so severe that I fell down and had to stay on the ground until it subsided." *Id*.

When Petitioner initially went to PT, his pain increased and his ROM worsened after four sessions. Ex. 1 at ¶ 9. He then received his first steroid injection from Dr. Hannah, and did not "notice any improvement in the days after the injection." *Id*. He went to Dr. Kuhn, who administered another steroid injection and told him to rest for weeks or months to let his shoulder heal. *Id*. at ¶ 11. When Petitioner returned the following month, Dr. Kuhn suggested that he return to PT. *Id*.

Petitioner states that he "had to cancel several [PT] appointments because he was in too much pain to do the therapy." Ex. 3 at ¶ 12. After taking a short break, he returned to PT. *Id*. at ¶ 13. At this time, he continued to experience difficulty sleeping and nearly constant pain "to some degree." *Id*. at ¶ 14. He describes his shoulder injury as "profoundly disruptive" to his life. *Id*. at ¶ 16. He has missed time at work, lost sleep, and is no longer able to do some household repairs and hobbies. *Id*. at ¶ 17. As of December 2021, when he signed his affidavit, he continued to experience pain and stiffness, difficulty putting on shirts and jackets, showering, and tying his shoes. *Id*. at ¶ 18. He estimated his function as about 80% of what it was prior to his injury. *Id*.

Donna Rosenstiel, Petitioner's wife, filed an affidavit on his behalf. Ex. 4. She states that Petitioner's arm was sore within 24 hours after vaccination, but they both assumed it was a normal reaction to vaccination. *Id*. at ¶ 3. Even when the symptoms continued for several days they did not worry. *Id*. at ¶ 4. However, once a week passed, she became concerned. *Id*. at ¶ 5. When Petitioner started having difficulty moving his

5

arm without pain she became very concerned, and they discussed making an orthopedic appointment. *Id*. at ¶ 6.

Ms. Rosenstiel explains that Petitioner's pain was severe on many occasions, and that they both lost sleep many nights due to his shoulder pain; she was awakened regularly by him moaning or screaming in pain. Ex. 4 at ¶¶ 10-13. She corroborates Petitioner's account of extreme pain from swatting an insect, stating that "he literally fell to the ground" and she briefly "thought he was having a heart attack." *Id*. at ¶¶ 18-23. She adds that the treatments for his pain were, ironically, painful themselves. *Id*. at ¶ 29. Ms. Rosenstiel often had to help Petitioner put on a shirt or jacket, and had to do more household chores that Petitioner could no longer handle. *Id*. at ¶¶ 34-36. As of September 2022 (when she signed the affidavit), Ms. Rosenstiel stated that Petitioner's pain had not resolved and he experienced pain every day, many times per day. *Id*. at ¶¶ 39, 40.

John Roberson, Petitioner's father, filed an affidavit on his behalf. Ex. 5. Petitioner's father states that as soon as Petitioner received his flu vaccine, he told his father that his left arm was painful and he had lost mobility. *Id*. at ¶ 2. He recounts that in the spring of 2021, a storm caused extensive damage to a fence in Petitioner's backyard. *Id*. at ¶ 6. Normally, Petitioner would have been capable of repairing the fence himself; however, due to his injury he was unable to do so and had to hire a fencing company. *Id*. at ¶¶ 7-9.

Petitioner's father recalls a time when Petitioner needed to patch part of a concrete slab. Ex. 5 at ¶ 10. Normally, Petitioner would have been able to complete this task himself; however, due to his injury, his father did most of the work for him. *Id*. at ¶¶ 10-13. Petitioner's father adds that as of September 2022 (when he signed the affidavit), Petitioner still suffered from shoulder pain and limited ROM, and it likely impaired his ability to play golf and do woodworking, their two favorite hobbies to engage in together. *Id*. at ¶¶ 15, 16.

## II.    The Parties' Arguments

Petitioner seeks an award of $95,000.00 for past pain and suffering, relying on decisions in *Accetta*, *Hein*, *Dhanoa*, and *Parsons*, all involving awards between $85,000.00 and $95,000.00.[4] Petitioner's Motion for Ruling on the Record, filed April 24, 2025, at *9-12 (ECF No. 42) ("Mot."). Petitioner also seeks $20,000.00 for future pain and suffering, citing *Danielson*, in which the petitioner was awarded $7,922.22 for projected

---

[4] *Accetta v. Sec'y of Health & Human Servs.*, No. 17-1731V, 2021 WL 1718202 (Fed. Cl. Spec. Mstr. Mar. 31, 2021); *Hein v. Sec'y of Health & Human Servs.*, No. 19-1943V, 2021 WL 4805232 (Fed. Cl. Spec. Mstr. Sept. 14 2021); *Dhanoa v. Sec'y of Health & Human Servs.*, No.15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018); *Parsons v. Sec'y of Health & Human Servs.*, No. 19-1150V, 2020 WL 9060490 (Fed. Cl. Spec. Mstr. Nov. 30, 2023).

pain and suffering ($240.00 per year for life).[5] Mot. at *13. Petitioner asserts that he continued to feel the effects of his SIRVA nearly 24 months after it began, and his injury has caused him to lose sleep,  suffer agonizing pain, and miss activities he enjoys and responsibilities. *Id*. at *9.

Petitioner asserts that from September 2022 to early spring 2024, he felt pain throughout the day and his ROM was limited – though he has not filed or cited supporting evidence. Mot. at *9-10. Petitioner states, without evidence, that he continues to experience pain on a daily basis. *Id*. at *10.

Respondent proposes an award consistent with those from cases involving mild to moderate injuries. Response, filed July 25, 2025, at *10-14 (ECF No. 48) ("Resp."). Respondent provides two charts containing synopses of such milder cases (with awards ranging from $46,000.00 to $60,000.00) as well as moderate cases (with awards between $61,000.00 and $75,000.00), and states that he believes that Petitioner's circumstances, physical findings, and treatment/prognosis are most consistent with cases in the charts with awards at or around $60,000.00. *Id*.

Respondent characterizes Petitioner's overall injury as mild to moderate, with treatment featuring two steroid injections, 11 PT sessions, and prescription medication. Resp. at *10-13. Although Petitioner described his pain as intense at first, within a month he rated his pain three out of ten. *Id*. at *13. Within three months, he rated his pain between one and two out of ten, with some nighttime pain of five or six out of ten. *Id*. Respondent views Petitioner's treatment course as 13 months long, with a subsequent visit the following year. *Id*.

Respondent contends that the cases cited by Petitioner involved longer treatment and higher pain levels, noting that the *Parsons* petitioner's injury persisted for five years, as did that in *Accetta* (albeit with a lengthy gap in treatment). Resp. at *13. And the *Hein* petitioner suffered waxing and waning pain at higher levels than Petitioner and for longer – more than two years. *Id*. at *13-14. Respondent argues that Petitioner has "provided no evidence that he suffers a permanent disability, or that there are any circumstances justifying future damages," and thus is not entitled to an award for future pain and suffering. *Id*. at *13.

On reply, Petitioner now asserts that his symptoms persisted for at least *27 months* (without explaining why he increased the asserted duration from what he previously contended). Petitioner's Reply, filed Aug. 7, 2025, at *1 (ECF No. 49 ("Reply"). He quotes prior decisions stating that cases with higher awards involve petitioners who sought care promptly, suffered higher levels of pain (most in the upper half of a ten-point scale) for a longer period, and experienced moderate to severe ROM limitations. Reply at *2. He

---

[5] *Danielson v. Sec'y of Health & Human Servs*., No. 18-1878V, 2020 WL 8271642 (Fed. Cl. Spec. Mstr. Dec. 29, 2020).

asserts that his case meets many of these benchmarks, arguing that he "reported pain scores in the upper range" – not addressing the fact that this occurred *rarely*, and that most of the time his reported pain levels were low. *Id*.

Petitioner acknowledges that he reported low or no pain at rest, but asserts he suffered "excruciating pain during movement." Reply at *3. And he did not gain substantial, long-lasting relief from steroid injections. *Id*. at *4. He contends that on June 9, 2021, Dr. Kuhn measured his left shoulder internal rotation at zero degrees, and that 15 months later (September 2022), it had only improved to ten degrees. *Id*. He asserts that it is "well-documented that typical range of motion of the shoulder includes . . . internal rotation to the thoracic spine," and asserts that Petitioner's ROM measurements "confirm severe and persistent functional impairment."[6] *Id*.

Concerning future pain and suffering, Petitioner restates that he continues to experience pain to date, but without citing supporting evidence. Reply at *5.

### III.    Legal Standard

In another recent decision, I discussed at length the legal standard applicable to determinations of damages, as well as prior SIRVA compensation decisions within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Staub v. Sec'y of Health & Human Servs*., No. 23-1611V, 2026 WL 800520 (Fed. Cl. Spec. Mstr. Mar. 4, 2026).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs*., No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and

---

[6] Petitioner cites a 2022 Journal of Hand Surgery Global article (Wood, C. and Ilyas, A., Shoulder Injury Related to Vaccine Administration: Diagnosis and Management, J. Hand Surg. Glob. Online, Jan 28, 2022, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC8797178/ (last visited June 16, 2026)). in support of this contention. It appears that counsel found the article using ChatGPT. *See* Reply at *4 n.7 (citing the Wood and Ilyas article as "https://pmc.ncbi.nlm.nih.gov/articles/PMC8797178/?utm_source=chatgpt.com").

A single article does not, however, establish that something is "well-documented." Moreover, Petitioner has not demonstrated the relevance of the ROM measurements discussed in the article to measurements established in his medical records (e.g., how his measured ROM of zero and ten degrees in internal rotation with his arm abducted compares to what he asserts is "typical" ROM of internal rotation to the thoracic spine). Petitioner's counsel is cautioned that use of information from artificial intelligence programs such as ChatGPT without careful review and application to the specifics of their client's case is not only unpersuasive but could call into question the veracity or legitimacy of other citations contained in a brief or filing.

suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[7]

## IV.    Appropriate Compensation for Pain and Suffering

### A.  Past Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

I find that Petitioner suffered a relatively mild injury. Although he emphasizes the occasions when his pain reached higher levels, for the most part his reported pain remained on the low end of the scale. And Petitioner's argument concerning his ROM deficits is not adequately supported. While the record allows me to conclude he did exhibit instances of diminished ROM, this was not a consistent issue, and over time it improved. (And I do not give weight to instances where a claimant experiences *pain* after shoulder movement, and therefore is reluctant to engage in shoulder motion generally, since this is not congruent with actual *reduced* ROM).

The record best supports the conclusion that Petitioner's SIRVA was mostly resolved by October 2021, within 13 months of onset. At that time, he reported that he was able to do normal activities of life and was happy with his progress. Dr. Kuhn stated that he had made "great progress," and he should return only as needed. Ex. 3 at 92. Overall, he treated with two steroid injections, 11 PT sessions, prescription medication, and an MRI. His sleep was disturbed for approximately nine months.

When Petitioner returned to Dr. Kuhn nearly a year later, Dr. Kuhn noted that his adhesive capsulitis was "mostly resolved," though he continued to exhibit some posterior capsule tightness. Ex. 6 at 82. Dr. Kuhn instructed him to return in six weeks if he was not better. Petitioner has not provided any evidence that he did so, or sought other treatment.

The cases Petitioner cites involve significantly longer injuries, and thus do not provide much guidance for an award in this case. Of the cases Respondent cites, *McKenna* and *Alcantara* (in which the petitioners were awarded $65,000.00 and $70,000.00, respectively) provide the closest comparison to Petitioner's injury and

---

[7] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

treatment course.[8] Those petitioners had injuries of similar intensity and duration (with reports of lingering sequela much later) and similar treatment to Mr. Roberson (with the *McKenna* petitioner undergoing one more steroid injection than Mr. Roberson, but no PT, and the *Alcantara* petitioner undergoing more injections and PT sessions than Mr. Roberson). Both the *McKenna* and *Alcantara* petitioners sought care earlier than Mr. Roberson, possibly signaling a more serious injury.

Accordingly, I find that an award of **$65,000.00** for past pain and suffering is appropriate.

## B. Future Pain and Suffering

I have previously stated that SIRVA petitioners often continue to report some residual symptoms even after they have largely recovered, and "that fact alone does not typically support a future damages component." *Monson v. Sec'y of Health & Human Servs.*, No. 20-1350V, 2023 WL 2524059, at *7 (Fed. Cl. Spec. Mstr. Feb. 8, 2023). Instead, a claimant seeking future pain and suffering damages must preponderantly demonstrate, by objective proof, a medically-documented loss of function (often identified as permanent), or ongoing medical treatment needs that are not expected to abate. *Id*. (citing *Hooper v. Sec'y of Health & Human Servs.*, No. 17-0012V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019)).

In this case, at Petitioner's September 2022 appointment, his orthopedist noted that his adhesive capsulitis was "mostly resolved." Ex. 6 at 82. In addition, Petitioner's most recent medical or testimonial evidence is from September 2022 – nearly four years ago. This evidence does not suggest the sort of remaining symptoms that would justify a future damages award.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $65,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[9] Additionally, I find that

---

[8] *McKenna v. Sec'y of Health & Human Servs.*, No. 21-0030V, 2023 WL 5045121 (Fed. Cl. Spec. Mstr. July 7, 2023) and *Alcantara v. Sec'y of Health & Human Servs.*, No. 20-0990V, 2022 WL 2800868 (Fed. Cl. Spec. Mstr. June 10, 2022).

[9] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

Petitioner is entitled to **$1,120.41 in unreimbursable expenses**.[10]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $66,120,41, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[11]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[10] The parties agree that this sum is reimbursable. Mot. at *14; Resp. at *2 n.1.

[11] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.